**NORTHEAST WOMEN'S CENTER, INC., Appellant in No. 88–1268**

v.

**Michael McMONAGLE, Joseph P. Wall, Roland Markum, Howard Walton, Henry Tenaglio, Stephanie Morello, Annemarie Breen, Ellen Jones, Kathy Long, Susan Silcox, Paul C. Armes, Walter G. Geis, John J. O'Brien, James Codichini, Patricia Walton, John Breen, Dennis Sadler, Joan Andrews, Miriam Dwyer, Mary Byrne, John Murray, Linda Corbett, Thomas McIlhenny, Patricia Ludwig, Gerrald Lynch, Margaret Caponi, Deborah Baker, Thomas Herilhy, Pasquale Varallo, John Stanton, Anne Knorr, John Connor, Elliott Stevens, Harry Hand, Laurie Wirfell, Helena Gaydos, Robert Moran, Earl Essex, Patricia McNamara, Donna Andracavage, Juan Guerra, and Linda Hearn.**

**Appeal of Michael McMONAGLE, Dennis Sadler, Mary Byrne, Deborah Baker, Margaret Caponi, Thomas Herlihy, Anne Knorr, and Robert Moran.**

**Appeal of John J. O'BRIEN, Joseph Wall, Roland Markum, Howard Walton, Patricia Walton, Henry Tenaglio, Stephanie Morello, Annemarie Breen, Ellen Jones, Kathy Long, Susan Silcox, Paul Armes and Walter Gies.**

**Appeal of Patricia McNAMARA and Thomas McIlhenny.**

**Appeal of Donna ANDRACAVAGE, Juan Guerra, and Helena Gaydos.**

Nos. 88–1268, 88–1333, 88–1334, 88–1335 and 88–1336.

United States Court of Appeals, Third Circuit.

Argued Oct. 20, 1988.
Decided March 2, 1989.
Rehearing and Rehearing In Banc Denied March 30, 1989.

■

Edmond A. Tiryak (argued), Julie Shapiro Philadelphia, Pa., for appellant, Northeast Women's Center, Inc.

Christine Smith Torre (argued), Philadelphia, Pa., for appellees/cross-appellants, Michael McMonagle, Dennis Sadler, Mary Byrne, Deborah Baker, Margaret Caponi, Thomas Herlihy, Anne Knorr and Robert Moran.

Charles F. Volz, Jr. (argued), Philadelphia, Pa., for appellees/cross-appellants, John J. O'Brien, Joseph Wall, Roland Markum, Howard Walton, Patricia Walton, Henry Tenaglio, Stephanie Morello, Annemarie Breen, Ellen Jones, Kathy Long, Susan Silcox, Paul Armes and Walter Gies.

Thomas J. Short (argued), Oreland, Pa., for appellees/cross-appellants, Patricia McNamara and Thomas McIlhenny.

Joseph P. Stanton (argued), Iovine & Woods, P.C., Philadelphia, Pa., for appellees/cross-appellants, Donna Andracavage, Juan Guerra and Helena Gaydos.

Laura E. Little, David S. Thalheimer, Dechert, Price & Rhoads, Susan Cary Nicholas, Women's Law Project, Philadelphia, Pa., for amici curiae in Support of Appellant, Northeast Women's Center, Inc., on Behalf of Certain Providers of Abortion Services and Other Organizations Committed to Protecting the Right to Choose Abortion and Preserving Access to Reproductive Health Services.

LeRoy S. Zimmerman, Atty. Gen., Gregory R. Neuhauser, Sr. Deputy Atty. Gen., John G. Knorr, III, Chief Deputy Atty. Gen., Chief, Litigation Section, Harrisburg, Pa., for amicus curiae, Com. of Pennsylvania.

J. Michael Considine, Jr., Joseph D. Shein, P.C., Philadelphia, Pa., for amicus curiae, The Rutherford Institute of Pennsylvania.

Before SLOVITER and HUTCHINSON, Circuit Judges, and GERRY, District Judge.*

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Following a lengthy trial in this action brought by a women's health center against a group of anti-abortion activists, the jury returned a verdict for plaintiff on its claims under civil RICO and the state torts of trespass and intentional interference with contract. On appeal, plaintiff challenges the district court's use of the unclean hands doctrine to limit the injunctive relief given and the court's order setting aside the jury's punitive damage award. Defendants, who have filed multiple briefs, raise more than twenty issues on their cross-appeals, including the application of civil RICO, the availability of the justification defense, and various claims of prejudicial error at trial.

Although issues on appeal are generally considered first, we begin with a discussion of the matters raised on defendants' cross-appeal because, if defendants' contentions are correct, we need not reach the appellant's issues. We will confine our opinion to those issues raised by defendants that we believe merit discussion.[1]

I.

*Facts and Procedural History*

Plaintiff-appellant, the Northeast Women's Center, Inc. (Center), is a Pennsylvania corporation which provides gynecological services, including pregnancy testing and abortions. The defendants-appellees are twenty-six individuals[2] (referred to collectively as Defendants) who are vigorously opposed to abortion and who have repeatedly protested the Center's abortion services by activities at the situs of the

Center. Certain Defendants have attended Board of Directors meetings of the Pro-Life Coalition of Southeastern Pennsylvania and one defendant, Michael McMonagle, is its paid Executive Director.

The Center has emphasized throughout this litigation that it is not challenging Defendants' free speech right to make public their opposition to abortion. Instead, this lawsuit was brought alleging illegal and tortious activity by Defendants that went beyond Defendants' constitutional rights of speech and protest.

The Center presented evidence at trial that established that Defendants unlawfully entered the Center's facilities on four occasions. On December 8, 1984, approximately fifty protestors, including twelve Defendants, rushed into the Center's premises, which at that time were located at 9600 Roosevelt Boulevard in Northeast Philadelphia, and knocked down Center employees who attempted to prevent the mass entry into the building. Once inside, Defendants and others blocked access to rooms and strewed medical supplies on the floor.

Ardis Ryder, then acting administrator of the Center, testified that she decided on the basis of this incident to hire security guards for the first time in the Center's history to protect the safety of its employees and patients. One employee testified that she sustained injuries during this incident while attempting to prevent Defendants and others from forcing their way into a patient treatment room. She testified that as a result of such harassment she resigned from her position at the Center, and did not resume employment at the Center until after it installed a sophisticated security system. Twelve Defen-

---

* Hon. John F. Gerry, Chief Judge, United States District Court for the District of New Jersey, sitting by designation.

1. We conclude that the district court committed no error of law or abuse of discretion with respect to all other issues raised by defendants. Those issues are directed in the main to the court's denial of a stay until state criminal charges then pending against defendants were resolved; its rulings on the relevance of certain

videotape and witness testimony; and its rejection of defendants' argument that it was collaterally estopped from issuing injunctive relief. *See also* note 4 *infra.*

2. There were 42 individuals sued. Plaintiff ultimately dismissed its claims against 11 defendants either before or during trial. The court gave a directed verdict to four defendants, and dismissed one post-trial.

dants were among the thirty persons arrested and charged with trespass after this incident. App. at 633.

On August 10, 1985, twelve Defendants pushed into the Center's premises. An employee who was injured as a result of Defendants' activities lost work time. Another employee testified that after members of the group locked themselves in an operating room, she observed a Defendant leave the operating room with an object concealed under his coat. When the employee entered the room she discovered that machinery had been damaged and disassembled. Twelve Defendants were arrested and subsequently convicted of defiant trespass for the August 1985 incident. App. at 634; see Commonwealth v. Markum, 373 Pa.Super. 341, 541 A.2d 347 (1988) (affirming conviction on appeal).

On October 19, 1985, there was another attempt by anti-abortion activists to enter the Center. A number of persons were arrested, including twenty-four Defendants. App. at 635. Two persons did manage to rush through the doors and enter, knocking down a Center employee. Three Defendants were subsequently convicted of defiant trespass. App. at 635–36.

The fourth trespass that was the subject of the federal suit took place on May 23, 1986. The jury was shown a videotape of the incident, which showed protesters sitting down on the floor of a waiting room inside the clinic, standing in front of patients awaiting services and castigating them, and ignoring repeated requests that they cease trespassing and leave the building. Exhibits P–76, P–77. One Defendant stated, "We're going to shut this place down." The police eventually removed the trespassers. There was testimony that other Defendants who were outside the premises blocked the doors to the Center and the building in which it was located. Twenty-six persons, including sixteen Defendants, were arrested and fifteen Defen-

dants were subsequently convicted for criminal conspiracy, disorderly conduct, and/or defiant trespass as a result of this incident. App. at 637–38.

Witnesses at the trial in this case testified that on these and other occasions they observed Defendants photographing patients, chanting through bullhorns, blocking building entrances, and surrounding and pounding on the windows of employees' cars. In fact an assistant district attorney who witnessed a demonstration testified that the demonstrators' activity rose to a "frenzy" and that he delayed leaving the Center out of fear for his physical safety. App. at 791–93. Videotape evidence revealed demonstrators pushing, shoving and tugging on patients as they attempted to approach the Center, knocking over and crossing beyond police barricades and blocking the ingress of cars. A protester is recorded stating, "I bet you ten to one this place doesn't last six months." Another added, "This place is going to be shut down." Exhibits P–6, P–76, P–77. A doctor employed by the Center testified that the sound of chanting, amplified by bullhorns, was audible in the Center's operating room. Another doctor testified that this noise would put patients "under considerably greater stress," especially when going under or coming out of general anesthesia. App. at 433.

Three employees testified that they were repeatedly subjected to picketing at their homes. Two of these employees stated that they resigned from their positions at the Center because of Defendants' actions at their homes and the Center.

In July 1986, the Center lost its lease and moved to a new location. Both the director of the Center and defendant McMonagle, a leader of the activists, attributed the Center's loss of its lease to Defendants' activities at the Center.[3] The Center installed a new sophisticated security system at its

---

**3.** A fundraising letter signed by McMonagle, which was admitted into evidence, stated:

Our organization is encouraging and organizing increasingly effective protests at these abortion chambers.... In March, 1985 we received the welcome news that the Northeast Women's Center abortion chamber ... would not have its lease renewed.... [T]his abortion chamber lost its lease because of the persistent prayers and protests of Pro Life citizens. App. at 480–82.

new location.[4] In August 1986, protesters made a fifth attempt to enter the Center, which the district court found was "thwarted only by the installation of sophisticated security equipment." App. at 260.

In August 1985, the Center filed a civil suit in the United States District Court for the Eastern District of Pennsylvania, alleging that Defendants had agreed among themselves and others to disrupt the Center's business and injure its property by, *inter alia*, harassing the Center's clients and employees, unlawfully entering on its property, and destroying and damaging medical equipment. The Center sought damages and injunctive relief under the Sherman Antitrust Act, 15 U.S.C. §§ 1, the Clayton Act, § 15, and the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, and the common law torts of trespass and intentional interference with contractual relations. The district court denied Defendants' motion to dismiss the complaint. *Northeast Women's Center, Inc. v. McMonagle*, 624 F.Supp. 736 (E.D.Pa.1985).

Thereafter, the Center sought preliminary injunctive relief, contending that Defendants had intensified their harassment of patients and staff, that they were acting to prevent the Center from moving to its new location, and that Defendants had forcibly entered its premises twice since the complaint was filed. The district court's denial of a preliminary injunction was vacated by this court because the district court had not made the factual findings required under Fed.R.Civ.P. 52(a). *Northeast Women's Center, Inc. v. McMonagle*, 813 F.2d 53 (3d Cir.1987). We suggested "in the strongest possible terms" that the parties agree to convert the action into a final injunction hearing, *id.* at 54–55, which they did.

At the close of a three-week trial, the district court directed a verdict in favor of Defendants on the Sherman Act charge, but sent to the jury the remaining RICO, trespass, and intentional interference with contract claims. In response to a detailed series of interrogatories prepared by the district court, the jury found twenty-seven Defendants liable under RICO and assessed $887 in damages on this claim, reflecting the cost of repairing certain medical equipment, which the district court trebled pursuant to 18 U.S.C. § 1964(c) (1982). The jury found that three Defendants had interfered with the Center's contracts with its employees but found no proximate loss to have resulted from this interference and awarded no damages on this claim. Finally, it found twenty-four Defendants liable for trespass, and assessed $42,087.95 in compensatory damages and $48,000 in punitive damages ($2,000 per defendant).

The district court denied Defendants' motion for a new trial and judgment notwithstanding verdict except that it granted j.n. o.v. on the punitive damages award and set aside the jury's award of punitive damages on the ground that the Center had substantially prejudiced Defendants by failing to request punitive damages in a timely and consistent manner and by successfully precluding Defendants from presenting evidence of motive that would have been relevant on the punitive damages issue. 665 F.Supp. 1147.

The court declined to give the Center any injunctive relief on its successful claims on the RICO and interference with contract counts on the ground that such relief was barred by the doctrine of unclean hands, based on evidence that a physician practicing at the Center had failed to comply with a fetal tissue inspection provision of the Pennsylvania Abortion Control Act, 18 Pa. Cons.Stat.Ann. § 3214(c) (Purdon 1983).

The court granted injunctive relief on the Center's trespass claim, however, and enjoined Defendants from entering the Center's premises, entering the parking lot adjacent to the Center for the purpose of protesting there, blocking or attempting to

---

**4.** Defendants challenge the measure of trespass damages, asserting that the Center cannot recover for its increased security costs. The Center, with appropriate citation to the record, notes that there was no objection to the district court's charge on this point. Defendants do not counter with any reference to the record showing that they properly preserved the issue. Accordingly, it is waived.

block the entrances to the Center or parking lot, and "[i]nhibiting or impeding or attempting to inhibit or impede the free and unmolested ingress and egress" to the Center or parking lot. 665 F.Supp. at 1163. The court specifically stated, that "[n]o portion of this Judgment shall be construed by any law enforcement officer so as to restrain the peaceful protesting, picketing, demonstrating, chanting, or leafletting by the defendants on the sidewalks abutting [the adjacent] road, EXCEPT as provided [under the rest of the order]." *Id.* at 1164.

As noted above, each side appeals. We turn first to the Defendants' challenge to the jury's verdict under civil RICO, the only remaining federal claim.

## II.

### *Issues on Cross–Appeal*

#### A. *Application of Civil RICO*

Plaintiff pled, and the jury's verdict shows that it found, a RICO violation based on a pattern of extortionate acts as defined under the Hobbs Act. The civil provisions of RICO allow "[a]ny person injured in his business or property" through a violation of the statute to file suit in federal district court. 18 U.S.C. § 1964(c) (1982). A defendant may be held liable under RICO for engaging through an enterprise in "a pattern of racketeering activity," 18 U.S.C. § 1962(c),[5] such racketeering activity being manifested by, *inter alia*, any act, including robbery and extortion, which is indictable under 18 U.S.C. § 1951, also known as the Hobbs Act. 18 U.S.C. § 1961(1)(B). Defendants' arguments challenging the verdict against them under RICO are directed both to the application of civil RICO as such and to the application of the Hobbs Act.

In *Sedima, S.P.R.L. v. Imrex, Co.*, 473 U.S. 479, 499–500, 105 S.Ct. 3275, 3286–3287, 87 L.Ed.2d 346 (1985), the Supreme Court acknowledged that civil RICO was being applied in contexts far beyond those

originally intended, but explained that "this defect—if defect it is—is inherent in the statute as written, and its correction must lie with Congress. It is not for the judiciary to eliminate the private action in situations where Congress has provided it. . . ." *Id.* at 499–500, 105 S.Ct. at 3286–3287. In light of the Court's statements, we are not free to read additional limits into RICO once a plaintiff has made out all of the elements required for a finding of liability under the statute's explicit provisions. *See Gilbert v. Prudential–Bache Sec.*, 769 F.2d 940, 942 (3d Cir.1985) ("The Court [in *Sedima* ] refused to read into civil RICO any requirement, unexpressed by Congress, that the statute be confined to situations implicating organized crime. . . .").

 Defendants argue that because their actions were motivated by their political beliefs, civil RICO is inapplicable. Defendants' description of their conduct as "civil disobedience" does not thereby immunize it from statutes proscribing the very acts the jury found Defendants committed.

In upholding a conviction under RICO over defendants' objection to the government's contention that the robberies were committed to finance defendants' religious Black Muslim organization, this court stated, "The First Amendment, which guarantees individuals freedom of conscience and prohibits governmental interference with religious beliefs, does not shield from government scrutiny practices which imperil public safety, peace or order." *United States v. Dickens*, 695 F.2d 765, 772 (3d Cir.1982), *cert. denied*, 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983) (citations omitted). We would have grave concerns were these or any other defendants held liable under civil RICO for engaging in the expression of dissenting political opinions in a manner protected under the First Amendment. The district court's careful instructions to the jury with respect to the

---

**5.** The district court charged the jury that in order to prove an enterprise existed "[a]ll the plaintiff has to prove is the existence of an ongoing organization, either formal or informal in nature in which the various associates func-

tioned as a continuing unit. The enterprise must have an existence separate and apart from the pattern of activity in which it engages." App. at 1006. Defendants did not object to this portion of the charge.

scope of the protections of the First Amendment precluded such a result here.

The district court told the jury, "The First Amendment of the United States Constitution guarantees the defendants a right to express their views. The defendants have a constitutional right to attempt to persuade the Northeast Women's Center to stop performing abortions. They have a constitutional right to attempt to persuade the Center's employees to stop working there and they have a constitutional right to attempt to persuade the Center's patients not to have abortions there.... The mere fact, also, that the defendants or some of their protests may be coercive or offensive, does not diminish the First Amendment right to a protest." App. at 1010.

However, the court also told the jury, correctly, that, "the First Amendment does not offer a sanctuary for violators. The same constitution that protects the defendants' right to free speech, also protects the Center's right to abortion services and the patients' rights to receive those services." App. at 1011. The jury's award of damages under RICO was based on the destruction of the Center's medical equipment during one of the incidents of forcible entry into the Center. This award establishes that the jury found that Defendants' actions went beyond mere dissent and publication of their political views.

■ Defendants also argue that the Center failed to show that it suffered an injury to its "business or property" as required by RICO. 18 U.S.C. § 1964(c). The district court explicitly charged the jury with respect to this requirement. App. at 1020. Although Defendants argue that the Center failed to show any economic injury from the RICO violation, in effect Defendants' argument slides from the injury require-

ment under RICO to their claim that the Hobbs Act does not cover extortion of intangible rights. We will keep these issues analytically distinct. The RICO requirement of injury is met by evidence of injury to plaintiff's business *or* property. The Center claimed that it suffered tangible injury to its medical equipment during the forcible entry which was part of the alleged pattern of extortionate acts designed to drive it out of business. RICO requires no more. In *Sedima*, the Court rejected the notion of any distinct "racketeering injury," 473 U.S. at 495–97, 105 S.Ct. at 3284–85, holding expressly that it is not necessary that a plaintiff show that it suffered "a competitive injury." *Id.* at 497 n. 15, 105 S.Ct. at 3285 n. 15. The damage to the Center's property was sufficient to meet RICO's injury requirement.[6] *See Malley–Duff & Assocs. v. Crown Life Ins. Co.*, 792 F.2d 341, 355 (3d Cir.1986), *aff'd on other grounds*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) (delay, added expenses and inconvenience caused by defendants' interference with a lawsuit sufficient to meet injury requirement under RICO); *Zap v. Frankel*, 770 F.2d 24, 26 (3d Cir.1985) (district court's holding that plaintiff had to show injury " 'of the type the RICO statute was intended to prevent' " reversed; RICO plaintiff need allege "no independent 'racketeering injury' apart from the injury caused by the predicate acts").

■ Defendants also challenge the application of the Hobbs Act, which provided the predicate offenses under RICO. Defendants argue that the court's charge failed to deal "with the economic motivation behind the crime of extortion," which they claim is a necessary element under the Hobbs Act. Brief of Cross–Appellants O'Brien et al. at 26 (hereafter "O'Brien Brief").[7] Defendants point to no charge

---

**6.** There was ample evidence that the Center, a profit-making institution, advertised in interstate commerce and drew patients from other states, thereby satisfying the RICO interstate commerce requirement.

**7.** The Center argues that the evidence contradicts Defendants' claim that their activity was completely devoid of economic purpose, point-

ing to McMonagle's testimony that he raised $120,000 a year for the Pro–Life Coalition of Southeastern Pennsylvania which coordinated the protests at the Center and that he received a salary of $32,000 a year as the director of this organization. App. at 880–81. Because we conclude that economic motivation is unnecessary, we do not decide whether this evidence would be sufficient to show economic motivation.

proffered by them on economic purpose. In any event, Defendants' contention ignores well-established precedent holding that lack of economic motive does not constitute a defense to Hobbs Act crimes. In *United States v. Cerilli,* 603 F.2d 415, 420 (3d Cir.1979), *cert. denied,* 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980), we upheld a Hobbs Act conviction for solicitation of political contributions, stating, "[i]t is well-established that a person may violate the Hobbs Act without himself receiving the benefits of his coercive actions." *See United States v. Starks,* 515 F.2d 112, 124 (3d Cir.1975) ("there is no exception to the Hobbs Act" permitting extortion "for a religious purpose"); *see also United States v. Anderson,* 716 F.2d 446 (7th Cir.1983) (upholding Hobbs Act conviction of anti-abortion activists for threatening doctor to induce him to cease performing abortions).

Defendants contend, however, that "economic injury" is an essential element of extortion when it is used as a RICO predicate offense. O'Brien Brief at 29. They argue that the court's charge improperly relied on extortion of intangible "rights". *Id.* at 28.

The "right" on which the Center's case was predicated was the right to continue to operate its business. The Center's extortion claim was that Defendants used force, threats of force, fear and violence in their efforts to force the Center out of business. The court told the jury that, "[s]pecifically, defendants are charged with attempting and conspiring to extort from the Center its property interest in continuing to provide abortion services[;] from its employees, their property interest in continuing their employment with the Center[;] and from patients, their property interest in entering into a contractual relationship with the Center." App. at 1009.[8]

Rights involving the conduct of business are property rights. As we pointed out in *United States v. Local 560,* 780 F.2d 267,

281 (3d Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986), other circuits which have considered this question are unanimous in extending the Hobbs Act to protect intangible, as well as tangible, property. *See United States v. Zemek,* 634 F.2d 1159 (9th Cir.1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981) (right to solicit business accounts); *United States v. Santoni,* 585 F.2d 667 (4th Cir.1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979) (right to make business decisions free from outside pressure wrongfully imposed); *United States v. Nadaline,* 471 F.2d 340 (5th Cir.), *cert. denied,* 411 U.S. 951, 93 S.Ct. 1924, 36 L.Ed.2d 414 (1973) (right to solicit business accounts); *United States v. Tropiano,* 418 F.2d 1069 (2d Cir.1969), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970) (right to solicit business accounts).

It is, of course, no defense to extortion that Defendants did not succeed in their ultimate goal, although, as McMonagle's own letter admitted, Defendants' activities did contribute to the Center's loss of its lease at the Roosevelt Boulevard location. App. at 480–83; *see* note 3 *supra.* Attempted extortion and conspiracy to commit extortion are crimes under the Hobbs Act, *see* 18 U.S.C. § 1951(a), and "any act which is indictable under [the Hobbs Act]" is a predicate offense under RICO. 18 U.S.C. § 1961(1)(B). We thus reject Defendants' challenges dealing with the RICO verdict.

B. *The Justification Defense*

■ Defendants argue that the district court erred in precluding the admission of evidence relating to their claims of justification and in failing to charge the jury regarding such a defense. The district court relied on our opinion in *United States v. Malinowski,* 472 F.2d 850 (3d Cir.), *cert. denied,* 411 U.S. 970, 93 S.Ct. 2164, 36 L.Ed.2d 693 (1973), in holding that the justi-

---

**8.** We reject Defendants' argument that the district court improperly allowed extortion of employees to be asserted as predicate offenses. The evidence establishes that the harassment of Defendants' employees and patients was directly related to Defendants' goal to shut down the Center.

fication defense was unavailable to Defendants. In *Malinowski*, a defendant had falsely claimed excessive exemptions on a form submitted to the Internal Revenue Service to dramatize his protest to the Vietnam War. We rejected the defense of good faith motive, holding that the defendant's motives could not constitute an acceptable legal defense. *Id.* at 856. We stated that, "[s]uch a position represents a feeble effort to emasculate basic principles of civil disobedience, and, simply stated, is invalid.... [T]he actor wants the best of both worlds; to disobey, yet to be absolved of punishment for disobedience." *Id.* at 857.

Similarly, in *United States v. Romano*, 849 F.2d 812, 816 n. 7 (3d Cir.1988), we recently reaffirmed the irrelevance of any defense based on an intent to save lives in a case charging a defendant, who was associated with the Epiphany Plowshares, with damaging government property, conspiring to do so, and entering a military installation for an unlawful purpose. We stated that, "[the defendant's] end motive of protecting innocent lives could not adequately negate or explain her specific intent to achieve this end by breaking into a military installation and disabling military aircraft." *Id.* (citations omitted). Thus, it is clear that Defendants' claim of justification does not present a viable defense to the RICO charge.

■ Defendants argue, however, that justification is a defense under Pennsylvania law, citing to the Pennsylvania Crimes Code, 18 Pa.Cons.Stat.Ann. § 503(a) (Purdon 1983)[9], and its civil analogue. *See Restatement (Second) of Torts*, §§ 76, 196 (1965). In *Commonwealth v. Capitolo*, 508 Pa. 372, 498 A.2d 806 (1985), the Pennsylvania Supreme Court held that under section 503 of the Pennsylvania Crimes Code, the availability of the justification defense rests on a defendant's ability to show: "(1) that the actor was faced with clear and imminent harm ...; (2) that the actor could reasonably expect that [his/her] actions would be effective in avoiding this greater harm; (3) that there [was] no legal alternative [that would have been] effective in abating the harm; and (4) that the Legislature has not acted to preclude the defense by a clear and deliberate choice regarding the values at issue." 508 Pa. at 378, 498 A.2d at 809. The defendants in *Capitolo* had been convicted for criminal trespass based on their sit-in demonstration at a nuclear power plant which caused no injuries or property damage. The Supreme Court of Pennsylvania, applying the foregoing analysis, held that "[t]he trial court was correct in ruling that, as a matter of law, justification was not an available defense." 508 Pa. at 379, 498 A.2d at 809.

In a subsequent case, the Court applied the *Capitolo* factors to the justification defense codified under another section of the Crimes Code. *Commonwealth v. Berrigan*, 509 Pa. 118, 124, 501 A.2d 226, 230 (1985). On the basis of those factors, the Court rejected the contention of defendants convicted of burglary, criminal mischief, and criminal conspiracy in connection with a protest at a nuclear arms manufacturing facility that their actions were permitted to avert a nuclear holocaust.

The test in *Capitolo* was recently applied by the Superior Court of Pennsylvania in *Commonwealth v. Wall*, 372 Pa.Super.

---

9. Section 503 of the Crimes Code provides:
§ 503. Justification generally.
(a) General rule.—Conduct which the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable if:
(1) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged;
(2) neither this title nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and

(3) a legislative purpose to exclude the justification claimed does not otherwise plainly appear.
(b) Choice of evils.—When the actor was reckless or negligent in bringing about the situation requiring a choice of harms or evils or in appraising the necessity for his conduct, the justification afforded by this section is unavailable in a prosecution for any offense for which recklessness or negligence, as the case may be, suffices to establish culpability.

534, 539 A.2d 1325 (1988), to defendants convicted of criminal trespass and defiant trespass during an abortion protest. In that unanimous opinion, the court upheld the trial court's order precluding the defendant from raising the justification defense. The *Wall* court found that the justification defense was not available because the defendant could not establish *"any"* of the four requirements set forth in *Capitolo.* 372 Pa.Super. at 543, 539 A.2d at 1329 (emphasis in original). Wall could not demonstrate that he was faced with a clear and readily apparent harm, because the law does not recognize abortions as a harm, 372 Pa.Super. at 540–42, 539 A.2d at 1328–29; Wall could not reasonably have expected that the demonstration would be effective because his disruption of the clinic was only temporary, 372 Pa.Super. at 542, 539 A.2d at 1329; he had available legal alternatives, such as lobbying and providing information to the clinic's clients while standing on public property, *id.;* and Pennsylvania legislation, while it regulated abortion, did not prohibit a woman from obtaining an abortion. 372 Pa.Super. at 542–43, 539 A.2d at 1329; *see also Commonwealth v. Markum,* 373 Pa.Super. 341, 541 A.2d 347 (1988) (announcing judgment of the court that justification defense not available against criminal convictions stemming from August 1985 invasion of the Center).

The same analysis is applicable here. We emphasize in particular the numerous legal alternatives that Defendants had available to pursue their goal of persuading women not to have abortions. For example, they could continue to march, go door-to-door to proselytize their views, distribute literature, personally or through the mails, and contact residents by telephone, short of harassment. *See Frisby v. Schultz,* —— U.S. ——, 108 S.Ct. 2495, 2501–02, 101 L.Ed.2d 420 (1988).

---

**10.** The district court's order was, in relevant part, as follows:

 The plaintiff's motion to preclude the introduction of evidence concerning justification and motive is GRANTED. Defense counsel may, in the opening statement to the jury,

In one of their reply briefs, Defendants argue that *Wall* should be distinguished because the court there did not focus on Defendants' argument made here that abortions conducted in the second, as opposed to the first, trimester of pregnancy, together with the harm suffered by women undergoing abortions, amount to a harm of sufficient magnitude and imminence that the justification defense should be allowed. Because Defendants must meet each *Capitolo* factor, however, *see Capitolo,* 508 Pa. at 378–79, 498 A.2d at 809; *Commonwealth v. Berrigan,* 509 Pa. 118, 124, 501 A.2d 226, 229 (1985), we need not reach their argument concerning the character of the harm involved. We find no error in the district court's rejection of Defendants' justification defense.

## C. *The Conduct of the Trial*

Defendants rather vehemently complain about the conduct of the trial. They point to a number of rulings by the district court which they argue constitute reversible error either as considered severally or as added together to create an unfairly prejudicial atmosphere at trial. In particular, they challenge the court's grant of the Center's motion *in limine* to exclude evidence of Defendants' motives and its refusal to grant a mistrial after the Center's counsel made several allegedly "prejudicial and inflammatory" statements.

The jury was told in the Center's opening remarks that Defendants were opposed to abortion as a matter of principle. The court, in its jury charge, told the jury that "[w]e know why these people are up there and that is because they disagree with the position of the plaintiffs, that there should be abortions performed." App. at 946.

However, the district court's order precluded Defendants from putting on further evidence of their motives without making a prior showing of relevance.[10] Defendants

explain the circumstances surrounding the defendants' presence in the plaintiff's property. Counsel may not extract testimony or introduce evidence of the defendants' beliefs on abortion absent a prior demonstration of the relevance of the proposed evidence. Counsel

acknowledged at oral argument that they never made an offer of proof of the relevance of the evidence of motive which they now argue they desired to present. Having failed to make such an offer of proof, they have waived this issue on appeal. *See* Fed.R.Evid. 103(a)(2). Moreover, on the merits, we note that we upheld a similar *in limine* order in *United States v. Romano*, 849 F.2d at 815–16.

■ The district court's orders denying Defendants' motions for a mistrial based on the allegedly inflammatory remarks made by the Center's counsel during the course of the trial are reviewed under an abuse of discretion standard. *See United States v. DeRosa*, 548 F.2d 464, 473 (3d Cir.1977). We have examined each portion of the record to which Defendants refer us. Although we do not place our imprimatur on some of the conduct by various trial counsel, we conclude that the district court did not abuse its discretion in denying Defendants' motion for a mistrial. Far from having deprived Defendants of fundamental rights, we conclude that Judge James M. Kelly handled this emotionally heated trial fairly and evenhandedly. We will affirm all of the orders challenged by Defendants on their cross-appeals.

## III.

*Issues on Appeal*

A. *Application of The Unclean Hands Doctrine*

■ The first of the two issues raised by the Center on its appeal challenges the limited injunctive relief awarded by the district court. The district court ruled that the Center was precluded from obtaining injunctive relief on any charge other than trespass because of the unclean hands doctrine. Although the district court enjoined Defendants from trespassing on the Center's property or the private parking lot next to the Center, and barred Defendants from obstructing the entrances to those premises, it gave no injunctive relief with respect to the acts of harassment and intimidation of the Center's employees and patients which provided the evidentiary basis for the jury's liability verdicts on the RICO and interference with contract claims.

In its discussion of the need for injunctive relief, the district court stated, "The spirited nature of [Defendants'] views permits no remorse or regret for their actions. No evidence produced at trial suggests that their unlawful modes of protest will cease. In fact, the evidence suggests precisely the opposite." 665 F.Supp. 1152. We can think of no reason why this finding, although made in the context of the district court's trespass discussion, is not equally applicable to Defendants' other activities. Nonetheless, the court refused to grant the additional injunctive relief requested by the Center because it concluded that section 3214(c) of the Pennsylvania Abortion Control Act had been violated because one of the Center's doctors testified that remains from those fetuses aborted in the second trimester were inspected for completeness by a pathology expert who was not board certified or board eligible.[11]

The district court held that the Center was charged with knowledge of the doctor's failure to comply with the Act's requirements, and that therefore the Center

---

may not argue or imply to the jury, in either an opening statement or closing argument, that the defendant's beliefs afford them any type of legal justification defense.
App. at 124.

11. 18 Pa.Cons.Stat.Ann. § 3214(c) provides:
When there is an abortion performed after the first trimester of pregnancy where the physician has certified the unborn child is not viable, the dead unborn child and all tissue removed at the time of the abortion shall be submitted for tissue analysis to a board eligible or certified pathologist. If the report re-

veals evidence of viability or live birth, the pathologist shall report such findings to the department within 15 days and a copy of the report shall also be sent to the physician performing the abortion. Intentional, knowing, reckless or negligent failure of the physician to submit such an unborn child or such tissue remains to such a pathologist for such a purpose, or intentional, knowing or reckless failure of the pathologist to report any evidence of live birth or viability to the department in the manner and within the time prescribed is a misdemeanor of the third degree.

engaged in "inequitable conduct [which] bars injunctive relief under RICO and interference with contract causes of action," 665 F.Supp. 1157–58.

In the course of making this ruling, the district court felt compelled to consider and rule upon the constitutionality of section 3214(c), although the constitutionality of the Pennsylvania statute was not an issue in this case and was then pending before another judge of the same court. Consequently, on appeal here the parties have devoted extensive briefing to this issue, the Attorney General has submitted a brief seeking to uphold the court's ruling on this issue, and the Center and some amici argue that this section is not operative. *See* note 12 *infra*. The parties' preoccupation with the constitutionality of section 3214(c) represents a diversion to collateral issues.

Ordinarily, an abuse of discretion standard applies to our review of the district court's application of the unclean hands doctrine. However, the parameters of the unclean hands doctrine implicate a matter of law.

As this court has explained, the equitable doctrine of unclean hands is not "a matter of 'defense' to the defendant." *Gaudiosi v. Mellon*, 269 F.2d 873, 882 (3d Cir.), *cert. denied*, 361 U.S. 902, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959). Rather, in applying it "courts are concerned primarily with their own integrity," *id.*, and with avoiding becoming " 'the abettor of iniquity.' " *Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592, 598 (3d Cir.), *cert. denied*, 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817 (1972) (citations omitted). Thus, the doctrine is to be applied "only where some unconscionable act of one coming for relief has immedi-

ate and necessary relation to the equity that he seeks in respect of the matter in litigation." *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245–46, 54 S.Ct. 146, 147–48, 78 L.Ed. 293 (1933).

The same principle applies under Pennsylvania law. *See In Re Estate of Pedrick*, 505 Pa. 530, 544, 482 A.2d 215, 222 (1984). Pennsylvania's Supreme Court has stated that the unclean hands doctrine is not to be applied "to collateral matters not directly affecting the equitable relations which exist between the parties." *Shapiro v. Shapiro*, 415 Pa. 503, 507, 204 A.2d 266, 268 (1964).

Even if there had been a violation of the requirement of section 3214(c) relating to examination of fetal tissue by one of the physicians practicing at the Center, an issue we do not reach,[12] such a violation is at most collateral to the matter involved in this lawsuit. Section 3214(c) is a technical provision aimed at policing compliance with the now inoperative nonviability certification requirement of section 3211.[13] It has no connection at all to the Defendants' actions which the jury found violated both federal and state law.

A recent Pennsylvania Supreme Court decision is illustrative of that Court's application of the unclean hands doctrine. In *In re Estate of Pedrick*, 505 Pa. 530, 544, 482 A.2d 215, 222 (1984), the Court held that unclean hands barred an attorney seeking to recover against an estate where the attorney sought "to secure a benefit from the very conduct which the accepted standards of the profession preclude." In contrast, in this case, the Center's alleged failure to insure that the pathologist who ex-

---

**12.** Because, as we hold in the text, the district court should not have reached that issue, we venture no opinion on the district court's conclusions that the Center failed to comply with section 3214(c) and that section 3214(c) is constitutional and enforceable under the statute in its present form.

**13.** In *American College of Obstetricians and Gynecologists v. Thornburgh*, 737 F.2d 283 (3d Cir. 1984), *aff'd*, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), we held unconstitutional section 3211(a), the provision that required physicians to certify the nonviability of fetuses

aborted after the first trimester of pregnancy. We expressly noted that the issue of the constitutionality of the related provision, section 3214(c), had been withdrawn from our consideration, 737 F.2d at 302. Thus, the continued validity of section 3214(c) remains an open question. The Center and some amici argue, however, that because section 3214(c) only requires inspection of fetal tissue after physicians have certified the nonviability of the fetus, and no such certification can now be required, section 3214(c) can have no effect. The district court did not address this argument, nor do we.

amined the fetal tissue was Board certified or Board eligible is not sufficiently, if at all, related to "the particular matter in litigation," *Shapiro,* 415 Pa. at 507, 204 A.2d at 268, to warrant application of the unclean hands doctrine to preclude granting the Center effective equitable relief from the Defendants' harassment of the Center, its employees, and its patients. Because the unclean hands doctrine can be applied only to conduct relating to the matter in litigation, we conclude that the district court erred in applying the unclean hands doctrine in this situation.

Defendants argue that further injunctive relief cannot be awarded under RICO because injunctive relief is not available to private parties under that statute's civil provisions. This is a question of first impression for this court and remains an open question in most other courts. *See Trane Co. v. O'Connor Sec.,* 718 F.2d 26, 28 (2d Cir.1983) (expressing "serious doubt" about availability of injunctive relief in private civil RICO cases); *Dan River, Inc. v. Icahn,* 701 F.2d 278, 290 (4th Cir.1983) (same); *Bennett v. Berg,* 685 F.2d 1053, 1064 (8th Cir.1982) (hinting that injunctive relief may be available). *But see Religious Technology Center v. Wollersheim,* 796 F.2d 1076, 1077 (9th Cir.1986), *cert. denied,* 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987) (injunctive relief not available); *In Re Fredeman Litigation,* 843 F.2d 821, 828–30 (5th Cir.1988) (suggesting approval of *Wollersheim* ). At oral argument the Center acknowledged that all the injunctive relief it seeks could be granted under its state law claim of interference with contractual relations, and therefore we will not reach to decide the RICO issue.

■ We see no impediment to basing injunctive relief on the interference with contractual relations verdict. The Center pleaded and proved that Defendants embarked on a willful campaign to use fear, harassment, intimidation and force against the Center through targeting its employees so that they would, and some did, sever their employment at the Center. Employees testified that they were even harassed at their homes and that their children were afraid. Defendants stress that the jury found no damages on its interference with contractual relations verdict. Of course, the fact the Center could not show damage on this claim or that not all the Center's employees have been sufficiently frightened so as to terminate their contractual relations with the Center does not preclude injunctive relief designed to prevent future harm.

■ Defendants argue that the district court is limited in granting injunctive relief under the interference with contractual relations claim to enjoining the three Defendants found liable under that charge. However, injunctions under Pennsylvania law are commonly entered against defendants and "all persons acting in concert with them." *See, e.g., Adler, Barish, Daniels, Levin & Creskoff v. Epstein,* 482 Pa. 416, 422, 393 A.2d 1175, 1178 (1978) (reinstating permanent injunction containing this language in intentional interference with contract case), *cert. denied and appeal dismissed,* 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979).[14] In fact, the Superior Court of Pennsylvania recently considered and rejected a similar argument in upholding a contempt order entered against anti-abortion activists for violating an injunction prohibiting certain individuals and "all others acting in concert with them" from entering an abortion clinic for purposes of interfering with its services. *Crozer–Chester Medical Center v. May,* 366 Pa.Super. 265, 267, 531 A.2d 2, 4 (1987), *appeal dismissed,* —— Pa. ——, 550 A.2d 196 (1988); *see also Neshaminy Water Resources Auth. v. Del–Aware Unlimited, Inc.,* 332 Pa.Super. 461, 471 n. 2, 481 A.2d 879, 883–84 & n. 2 (1984) (language binding all persons acting "in concert" with named defendants not impermissibly broad).

Fed.R.Civ.P. 65(d) expressly provides an injunction will be binding on persons "in active concert or participation" with the

14. Although Defendants argue that injunctive relief cannot be ordered when there has been no award of damages, we note that in *Adler* *Barish* only injunctive relief but not damages were awarded. *See* 482 Pa. at 419, 393 A.2d at 1176.

parties enjoined who receive actual notice of the order. In light of the jury's finding that the three Defendants against whom the verdict was entered on the interference with contractual relations claim combined in an enterprise with other Defendants, it appears that the record would support an injunction directed to concerted conduct.

 The Center argues that because this is now the second time that the district court failed to grant it effective injunctive relief, we should ourselves either enter its proposed injunction or at least we should direct the district court to do so in clear and unambiguous terms. While such a course might be expeditious, we decline to fix the terms of the injunction.[15] The district court is in a better position, in compliance with the requirements of Rule 65(d), to set the terms of an appropriate injunction based on the evidence in the record.

Since we have found unsupportable as a matter of law the only basis on which the district court declined to issue a more extensive injunction, we must remand this matter so that it can reconsider the Center's arguments that the injunction entered is inadequate.

### B. *Punitive Damages*

 The second issue raised by the Center challenges the district court's order granting Defendants' motion for a j.n.o.v. setting aside the jury's award of $2,000 punitive damages against each of twenty-four Defendants found liable for trespass. The district court explained that it entered the j.n.o.v. because it had erred in submitting the issue of punitive damages in its charge to the jury. In this context, our standard of review is abuse of discretion. *See United States v. Fischbach and Moore, Inc.,* 750 F.2d 1183, 1195 (3d Cir. 1984), *cert. denied,* 470 U.S. 1029, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985) (points for charge reviewed for abuse of discretion).

The district court gave a number of reasons for setting aside the punitive damages. It referred to the Center's failure to mention punitive damages in its pretrial memorandum as it was required to do under a local rule; the Center's failure to object to the court's pretrial order specifying the damage elements in the case, which did not include punitive damages; the Center's untimely request for a charge on punitive damages; and the court's preclusion of Defendants' evidence on motive in response to the Center's motion *in limine.* The latter ground alone is sufficient basis to uphold the court's order.

It is clear that under Pennsylvania law motive would have been relevant to the issue of punitive damages. *See Chambers v. Montgomery,* 411 Pa. 339, 344–45, 192 A.2d 355, 358 (1963); *Hughes v. Babcock,* 349 Pa. 475, 480–81, 37 A.2d 551, 554 (1944). However, under the court's *in limine* order, Defendants were precluded from referring to or relying on their motives unless they made a prior showing of relevance. While it is true that Defendants did not proffer motive evidence as relevant to their defense to punitive damages, the court's opinion suggests that Defendants were not on notice during the trial that the award of punitive damages was still an issue. A plaintiff may be barred from receiving relief it requests if its conduct "improperly and substantially prejudiced the other party." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 424, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). As in *Albemarle,* the Center's "not merely tardy, but also inconsistent" conduct with respect to its claim for punitive damages, *id.,* prejudiced Defendants' ability to mount a case against imposition of such damages. It follows that the district court's ruling that the Center should not have been granted a jury charge on punitive damages was well within the scope of its discretion. Thus, we

---

**15.** The proposed injunction would have imposed time, place and manner restrictions, including limitation of the number of demonstrators, the use of sound amplification during surgical procedures at the Center, and the harassment of staff and patients. We note that since the dis- trict court's opinion, the Supreme Court has shed additional light on the issue of residential picketing in its opinion in *Frisby v. Schultz,* —— U.S. ——, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988).

will not disturb the district court's award of a j.n.o.v. on this issue.

## IV.

### *Conclusion*

In summary, we have concluded on the cross-appeal that civil RICO could appropriately be applied to Defendants' intimidation and harassment of the Center resulting in the destruction of its property, that the district court did not err in rejecting the justification defense proffered by Defendants and in precluding evidence of Defendants' motives unless they showed the specific relevance of such evidence, and that there is no basis in the district court's conduct or rulings to order a new trial. On the Center's appeal, we have upheld the district court's order setting aside the punitive damages. Finally, we have held that the court erred in applying the unclean hands doctrine on a collateral matter to preclude injunctive relief.

For the reasons expressed herein, we will remand for further consideration of the injunctive relief to be granted in light of our opinion. We will affirm the district court's judgment in all other respects.